IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BASSAM AL DOUBAYKHI,

        Petitioner,

  v.

GEORGE W. BUSH, *et al.*,

        Respondents.

Civil Action No. 05-2369 (RWR)

## DECLARATION OF TERESA A. McPALMER

Pursuant to 28 U.S.C. § 1746, I, Commander Teresa A. McPalmer, Judge Advocate General's Corps, United States Navy, hereby state that to the best of my knowledge, information, and belief, the following is true, accurate and correct:

1.    I am the Legal Advisor to the Office for the Administrative Review of the Detention of Enemy Combatants at U.S. Naval Base Guantanamo Bay, Cuba (OARDEC). In that capacity I am an advisor to the Director, Combatant Status Review Tribunals.

2.    I hereby certify that the documents attached hereto constitute a true and accurate copy of the portions of the record of proceedings before the Combatant Status Review Tribunal related to petitioner Bassam Al Doubaykhi that are suitable for public release. The portions of the record that are classified or considered law enforcement sensitive are not attached hereto or were redacted by an OARDEC staff member. This staff member also redacted information that would personally identify certain U.S. Government personnel in order to protect the personal privacy and security of those individuals.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  30 August 2006

Teresa A. McPalmer
CDR, JAGC, U. S. Navy





# Department of Defense
## Director, Combatant Status Review Tribunals

OARDEC/Ser: 062

~~FOR OFFICIAL USE ONLY~~

2 5 FEB 2005

From: Director, Combatant Status Review Tribunal

Subj: REVIEW OF COMBATANT STATUS REVIEW TRIBUNAL FOR DETAINEE ISN # 340

Ref: (a) Deputy Secretary of Defense Order of 7 July 2004
(b) Secretary of the Navy Order of 29 July 2004

1. I concur in the decision of the Combatant Status Review Tribunal that Detainee ISN #340 meets the criteria for designation as an Enemy Combatant, in accordance with references (a) and (b).

2. This case is now considered final and the detainee will be scheduled for an Administrative Review Board.

J. M. McGARRAH
RADM, CEC, USN

Distribution:
NSC (Mr. John Bellinger)
DoS (Ambassador Prosper)
DASD-DA
JCS (J5)
SOUTHCOM (CoS)
COMJTFGTMO
OARDEC (Fwd)
CITF Ft Belvoir



UNCLASSIFIED

26 Jan 05

MEMORANDUM

From: Assistant Legal Advisor
To:   Director, Combatant Status Review Tribunal
Via:  Legal Advisor    JPC

Subj: LEGAL SUFFICIENCY REVIEW OF COMBATANT STATUS REVIEW TRIBUNAL
      FOR DETAINEE ISN # 340

Ref:  (a) Deputy Secretary of Defense Order of 7 July 2004
      (b) Secretary of the Navy Implementation Directive of 29 July 2004

Encl: (1) Appointing Order for Tribunal # 27 of 9 December 2004
      (2) Record of Tribunal Proceedings

1. Legal sufficiency review has been completed on the subject Combatant Status Review
Tribunal in accordance with references (a) and (b). After reviewing the record of the Tribunal, I
find that:

    a. The detainee was properly notified of and actively participated in the Tribunal process.
The detainee provided a sworn oral statement at the Tribunal hearing.

    b. The Tribunal was properly convened and constituted by enclosure (1).

    c. The Tribunal substantially complied with all provisions of references (a) and (b).
Note that some information in exhibit R-6 was redacted. The FBI properly certified in
exhibit R-2 that the redacted information would not support a determination that the
detainee is not an enemy combatant.

    d. The detainee requested one witness, another detainee. The detainee proffered that this
witness could testify about his plans and verify that he never trained in a camp. The
detainee also proffered that the witness would testify how the detainee obtained the
money in his possession when he was captured. The Tribunal President did not render a
formal decision on the witness's relevance, although it is clear from the proffer that the
detainee was relevant. The Tribunal President also determined that the witness was
reasonably available. The requested witness declined to testify. At that point, the
Tribunal President should have made a formal determination that the witness was not
reasonably available. However, this technical error does not affect the legal sufficiency
of the proceeding and certainly did not prejudice the detainee in any way. No corrective
action is required.

    The detainee did not request any other witnesses or evidence.

UNCLASSIFIED

UNCLASSIFIED

Subj:  LEGAL SUFFICIENCY REVIEW OF COMBATANT STATUS REVIEW TRIBUNAL
FOR DETAINEE ISN # 340

  e.  The Tribunal's decision that detainee #340 is properly classified as an enemy
combatant was unanimous.

2.  The proceedings and decision of the Tribunal as reflected in enclosure (2) are legally
sufficient and no corrective action is required.

3.  I recommend that the decision of the Tribunal be approved and the case be considered final.

BREE A. ERMENTROUT
CDR, JAGC, USNR

2
UNCLASSIFIED



Department of Defense
Director, Combatant Status Review Tribunals

9 Dec 04

From:  Director, Combatant Status Review Tribunals

Subj:  APPOINTMENT OF COMBATANT STATUS REVIEW TRIBUNAL #27

Ref:   (a) Convening Authority Appointment Letter of 9 July 2004

By the authority given to me in reference (a), a Combatant Status Review Tribunal established by "Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at Guantanamo Bay Naval Base, Cuba" dated 29 July 2004 is hereby convened. It shall hear such cases as shall be brought before it without further action of referral or otherwise.

The following commissioned officers shall serve as members of the Tribunal:

        MEMBERS:

             █████████████ Colonel, U.S. Army; President

             ████████████ Lieutenant Colonel, U.S. Air Force; Member

             ███████████████, Lieutenant Colonel, U.S. Air Force; Member (JAG)

                               _J. M. McGarrah (signature)_

                                J. M. McGARRAH
                                Rear Admiral
                                Civil Engineer Corps
                                United States Navy



## HEADQUARTERS, OARDEC FORWARD
GUANTANAMO BAY, CUBA
APO AE 09360

7 January 2005

MEMORANDUM FOR DIRECTOR, CSRT

FROM: OARDEC FORWARD Commander ICO ISN 340

1. Pursuant to Enclosure (1), paragraph (I)(5) of the *Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at Guantanamo Bay Naval Base, Cuba* dated 29 July 2004, I am forwarding the Combatant Status Review Tribunal Decision Report for the above mentioned ISN for review and action.

2. If there are any questions regarding this package, point of contact on this matter is the undersigned at DSN ▇▇▇▇▇.

CHARLES E. JAMISON
CAPT, USN

SECRET//NOFORN//X1

### (U) Combatant Status Review Tribunal Decision Report Cover Sheet

(U) This Document is UNCLASSIFIED Upon Removal of Enclosures (2) and (4).

(U) TRIBUNAL PANEL: ___#27___

(U) ISN#: ___340___

Ref:  (a) Convening Order for Tribunal #27 of 9 December 2004 (U)
      (b) CSRT Implementation Directive of 29 July 2004 (U)
      (c) DEPSECDEF Memo of 7 July 2004 (U)

Encl:  (1) Unclassified Summary of Basis for Tribunal Decision (U//FOUO)
       (2) Classified Summary of Basis for Tribunal Decision (S//NF)
       (3) Summary of Detainee/Witness Testimony (U//FOUO)
       (4) Copies of Documentary Evidence Presented (S//NF)
       (5) Personal Representative's Record Review (U)

(U) This Tribunal was convened on 28 December 2004 by references (a) and (b) to make a determination as to whether the detainee meets the criteria to be designated as an enemy combatant as defined in reference (c).

(U) The Tribunal has determined that Detainee #340 is properly designated as an enemy combatant as defined in reference (c).

(U) In particular, the Tribunal finds that this detainee is a member of, or affiliated with, al Qaida, as more fully discussed in the enclosures.

(U) Enclosure (1) provides an unclassified account of the basis for the Tribunal's decision. A detailed account of the evidence considered by the Tribunal and its findings of fact are contained in enclosures (1) and (2).

Colonel, U.S. Army
Tribunal President

UNCLASSIFIED/~~FOUO~~

# UNCLASSIFIED SUMMARY OF BASIS FOR TRIBUNAL DECISION

### (Enclosure (1) to Combatant Status Review Tribunal Decision Report)

TRIBUNAL PANEL:      #27

ISN #:       340

## 1. Introduction

As the Combatant Status Review Tribunal Decision Report indicates, the Tribunal has determined that this detainee is properly classified as an enemy combatant and is a member of, or affiliated with, al Qaida. In reaching its conclusions, the Tribunal considered both classified and unclassified information. The following is an account of the unclassified evidence considered by the Tribunal. Any classified evidence considered by the Tribunal is discussed in Enclosure (2) to the Combatant Status Review Tribunal Decision Report.

## 2. Synopsis of Proceedings

The unclassified evidence presented to the Tribunal by the Recorder indicated that the Detainee is associated with al Qaida. The Detainee traveled from Saudi Arabia to Pakistan and the United Arab Emirates in September 2001. The Detainee was arrested at a checkpoint in Pakistan. The Detainee was in possession of a large sum of money when captured. The Detainee was arrested with another individual. This individual was a fighter at Tora Bora. This individual also attended paramilitary training camps. This individual was also the director of the Al Wafa organization in Herat. Al Wafa is a non-governmental agency considered a terrorist organization. The detainee met with a known al Qaida facilitator. The Detainee may have attended a terrorist training camp. The Detainee received special training in Kabul.

The Detainee chose to participate in the Tribunal process. He called one witness, requested no documents be produced, and made an oral, sworn statement. The Tribunal President found the requested witness was reasonably available, however, the witness chose not to testify on the Detainee's behalf. The Detainee, in his oral sworn statement, denied being an al Qaida member. The Tribunal President's evidentiary and witness rulings are explained below.

## 3. Evidence Considered by the Tribunal

The Tribunal considered the following evidence in reaching its conclusions:

    a. Exhibits: D-a and D-b, R-1 through R-17

    b. Testimony of the following persons: None.

UNCLASSIFIED/~~FOUO~~

UNCLASSIFIED/~~FOUO~~

c. Sworn statement of the detainee.

**4. Rulings by the Tribunal on Detainee Requests for Evidence or Witnesses**

The Detainee requested the following witness be produced for the hearing:

| Witness | President's Decision | Testified? |
|---------|---------------------|-----------|
| Bendar Al-Utaibi | reasonably available | no * |

\* The Detainee stated that this individual could testify as to what the Detainee was going to do, where the money came from and that he never trained in a camp. When contacted, the witness declined to testify on behalf of this Detainee. (See Exhibit D-b.)

The Detainee requested no additional evidence be produced.

**5. Discussion of Unclassified Evidence**

The Tribunal considered the following unclassified evidence in making its determinations:

a. The recorder offered Exhibits R-1 thru R-3 into evidence during the unclassified portion of the proceeding. Exhibit R-1 is the Unclassified Summary of Evidence. While this summary is helpful in that it provides a broad outline of what the Tribunal can expect to see, it is not persuasive in that it provides conclusory statements without supporting unclassified evidence. Exhibit R-2, FBI Request for Redaction, provided no usable evidence. Exhibit R-3 is the January 2004 Department of Homeland Security, Terrorist Organization Reference Guide, which highlights the Al-Wafa al-Igatha al-Islamia organization being on the Terrorist Exclusion List. While supportive in nature, the Tribunal had to look to classified exhibits for support of the Unclassified Summary of Evidence.

b. Essentially the only unclassified evidence the Tribunal had to consider was the Detainee's sworn testimony. A summarized transcript of the Detainee's sworn testimony is attached as CSRT Decision Report Enclosure (3). In sum, the Detainee stated he was arrested in Pakistan with a large sum of money, but he claimed the money was solely for the purpose of buying and selling antique coins, books and artifacts. He claimed he was from a wealthy family (father was in real estate and camels) in Saudi Arabia and that he dealt in antiques. The Detainee claimed when he arrived in Pakistan, he only had money to cover travel expenses, but when captured he had approximately $90,000 (US). When queried why would you carry such a large sum of cash, the Detainee claimed he was going to transfer it to Saudi Arabia, or exchange it for Kuwaiti money which is physically smaller in size so it could easily be hidden a suitcase and therefore not discovered, or finally he thought about simply putting it on a VISA card. He stated while in Pakistan he found two mummies - one small and one large. The Detainee claimed he solicited help from a local Pakistani (whose name he could not recall) to sell the mummies over the

UNCLASSIFIED/~~FOUO~~

UNCLASSIFIED/FOUO

Internet. Within 3-4 days the Detainee successfully sold the mummies to a Frenchman and that is how he came into $90,000 (US). After the sale, the Detainee admitted getting lost and seeking the assistance of a 'stranger' to help him get back to his hotel. The Detainee stated he sought to borrow money from this 'stranger' in order to get back to his hotel, where he allegedly left his $90,000 (US). The Detainee then stated that, after learning the 'stranger' also had a large sum of money, they agreed to stay together as a matter of safety and security, because Pakistan was a dangerous place with lots of criminals. When asked if he knew the stranger was associated with Al-Wafa, the Detainee said, "I don't think so, he only had money to donate to charities." The Detainee then indicated he willingly went with the 'stranger' to help him donate his large sum of money to some needy charities. At night, they traveled from Karachi to Quetta. In Quetta, the Detainee and the 'stranger' were directed toward a part town by guards at a checkpoint, but once they got there they only saw individuals. "We were not comfortable," so they turned around--deciding to donate the money to an organization. As they approached the checkpoint again, they were stopped. The Detainee stated at this time, the vehicle was searched and the guards found the large sum of cash and his laptop computer. They were arrested because they were Arabs. The Detainee said the guards mentioned the US would pay $5,000 for any Arab and if he could pay, they would release him; he did not pay. After being passed from the Pakistani Intelligence service, to a local hospital, the Detainee was ultimately transferred to US forces. The Detainee denied meeting a known al Qadia facilitator, attending a terrorist training camp, or receiving special training in Kabul. In fact the Detainee denied ever hearing of the name Kabul or having ever traveled to or being in Afghanistan.

    c. The Detainee repeatedly expressed concern about his personal safety both in Camp Delta and "if" returned to Saudi Arabia. He stated that he has been wrongly accused of being a spy and a non-Muslim and that he has received numerous death threats while in Cuba.

The Tribunal also relied on certain classified evidence in reaching its decision. A discussion of the classified evidence is found in Enclosure (2) to the Combatant Status Review Tribunal Decision Report.

**6. Consultations with the CSRT Legal Advisor**

No issues arose during the course of this hearing that required consultation with the CSRT legal advisor.

**7. Conclusions of the Tribunal**

Upon careful review of all the evidence presented in this matter, the Tribunal makes the following determinations:

    a. The Detainee was mentally and physically capable of participating in the proceeding. No medical or mental health evaluation was deemed appropriate.

UNCLASSIFIED/~~FOUO~~

   b. The Detainee understood the Tribunal proceedings. He asked no questions regarding his rights and actively participated in the hearing.

   c. The detainee is properly classified as an enemy combatant and is a member of, or affiliated with al Qaida.

**8. Dissenting Tribunal Member's Report**

None. The Tribunal reached a unanimous decision.

Respectfully submitted,

[signature redacted]

Colonel, U.S. Army
Tribunal President

UNCLASSIFIED/~~FOUO~~

### Summarized Sworn Detainee Statement

*The Tribunal President read the hearing instructions to the detainee. The detainee confirmed that he understood the process and had no questions.*

*The Recorder presented Exhibits R-1 thru R-3 into evidence and gave a brief description of the contents of the Unclassified Summary of Evidence (Exhibit R-1).*

*The Recorder confirmed that he had no further unclassified evidence or witnesses and requested a closed Tribunal session to present classified evidence.*

Tribunal President: I see that you have requested one witness, ISN#243. By his silence, he has elected not to participate here today.

*The Detainee did take the Muslim oath.*

*The Personal Representative read the accusations to the detainee so that he could respond to the allegations. The allegations appear in italics, below.*

*3.a. The detainee is associated with al Qaida:*

*3.a.1. The detainee traveled from Saudi Arabia to Pakistan and the United Arab Emirates in September 2001.*

Detainee: I cannot recall the exact date.

*3.a.2. The detainee was arrested at a checkpoint in Pakistan.*

Detainee: True.

*3.a.3. The detainee was in possession of a large sum of money when captured.*

Detainee: Right.

*3.a.4. The detainee was arrested with another individual.*

Detainee: Yes, this is true.

*3.a.5. The individual was a fighter at Tora Bora.*

Detainee: Not true. You want me to say something about this? One of the Saudi Arabia embassy representatives met me in Pakistan. I showed them all the documents I had, which would tell them what I did thru the time I spent in Pakistan, like the bills from the hotel and the communications between my family and me. The stuff I had on me when they arrested me, I was going to sell them. They arrested me before the fight in Tora Bora.

UNCLASSIFIED/~~FOUO~~

UNCLASSIFIED/FOUO

*3.a.6. This individual also attended paramilitary training camps.*

Detainee: That's not right.

*3.a.7. This individual was also the director of the Al Wafa organization in Herat.*

Detainee: I don't think so and I have reasons for that. This individual had a lot of money and he was looking for a charity organization, Saudi or others, to give it to them to help the poor people, Saudi charity organization or the Red Cross. If he had any relations with the Al Wafa organization he would not go and look for another organization to give the money to he would just give it to his organization. The other reason is he just came from Turkey. This is the second reason. The third reason is he never mentioned anything else, I was only with him for four days from the day I met him until the day they arrested me. He didn't say anything about being a member of the Al Wafa organization. That is the reason I have.

*3.a.8. Al Wafa is a non-governmental agency considered a terrorist organization.*

Detainee: I never heard about this name until I got here.

*3.a.9. The detainee met with a known al Qaida facilitator.*

Detainee: I met two people in Pakistan and I don't know if they were related to al Qaida or not, but if they were related to al Qaida they would have killed me because as I have stated before I didn't have a beard and I had a lot of dates with women. If they were members of al Qaida they hate these things because they are terrorist. They don't like people to have their own freedom to do such things. They would at least stop me from doing these things or kill me.

*3.a.10. The detainee may have attended a terrorist training camp.*

Detainee: Never

*3.a.11. The detainee received special training in Kabul.*

Detainee: Where is Kabul located?

Tribunal President: Kabul is a town in Afghanistan

Detainee: I have never been to Afghanistan. They have my passport and a representative from Saudi Arabia looked at my passport and there is nothing mentioned that I entered the borders. By the time I went to Pakistan until they arrested me it was a very short time. I could not have gone to Afghanistan to train there.

Tribunal President: Is there anything else you would like to tell us at this time?

UNCLASSIFIED/FOUO

UNCLASSIFIED/~~FOUO~~

Detainee: Two members of the Saudi Arabia embassy in Pakistan met me with another guy named Ali Abbott(ph). He is the head of the intelligent service in Pakistan. They looked at my documents and they mentioned to me, you are okay there is nothing against you. On the twenty-seventh, twenty-eighth, or the twenty-ninth of one month we call Shawall(ph), it is after the Ramadan. I got a piece of paper from the court in Pakistan saying that I was an innocent man in the second or the third session of the court. That was the day before they transferred me to the American people. I hope the American government can find the proof in my stuff that they could not find. I am sure if you find my stuff and go thru it you will find out I don't have anything to do with these accusations you have against me. I am a businessman. I feel that I am in danger if I stay here or go back to Saudi Arabia. Not from the government, but from the people around me over there. What I meant by that is, a lot of detainees here around me think that I am a spy. They think that I am working with the Soviet and the Americans. They threaten to kill me if I stay here or go back. Since I have been here these three years the detainees curse me and threaten to kill me if I stay here or go back to Saudi Arabia. I hope if I am found innocent you will not send me back to Saudi Arabia. I will seek an asylum in another country like Sweden. I will be away from the Arabs. Sweden is so far from Saudi Arabia. That is my suggestion to keep my live.

Tribunal President: I can tell you that we make a determination on your enemy combatant status, but as to anything else, that will be worked out with the Department of State. We will however make a note of your concerns.

Detainee: God bless you.

Tribunal President: At this time we may have some questions for you. Would you be willing to answer some questions?

*The Personal Representative and the Recorder had no further questions for the detainee.*

Tribunal Members' questions

Q.   Can you tell us why you went to Pakistan?
A.   I mentioned this to the interrogator many times. I went there looking for artifacts like old coins and old books because it is cheap there. As a businessman I would go buy it and I would transfer it to Arabs inmerant(ph), Saudi Arabia, or to Europe.

Q.   Have you made trips in the past to Pakistan for that same reason?
A.   No, that was my first time.

Q.   About how much money did you have?
A.   In what currency do you want?

UNCLASSIFIED/~~FOUO~~

UNCLASSIFIED/~~FOUO~~

Q.    Dollars would be fine.
A.    More than ninety thousand dollars.

Q.    How did you happen to have that amount?
A.    When I went to Pakistan, I had a little money to cover my expenses and to buy little stuff. After that I went to places in the North, which was North East Pakistan. I found out there was a lot of people that go and look for the stuff I want. They didn't know the value of the things they found and I bought it from them. I found a mummy. I bought one. I was planning to send it to Europe. I put it on the Internet. I had the help of a Pakistani translator; he did this for me on the Internet. I sold it to a French man. I had two, one big one small. I bought two of them. I sold them two days after I bought them. Most of that money came out of the sell of the two mummies and the rest was mine.

Q.    Is there anyway the investigators could be able to find documentation of that sell? For example you mentioned EBay. Do you know the website that you used?
A.    If you can find that Pakistani guy I'm talking about you would definitely get all the information you want.

Q.    What was you occupation before you started trading in commodities?
A.    After I left when I quit my education. I dealt with Arabian horses, used cars and perfumes. In Saudi Arabia we have free trade.

Q.    What is your education level?
A.    High School.

Q.    As far as finding that Pakistanian guy, do you have his name?
A.    His name is in Urdu. I cannot remember his name. If it was in Arabic I could have memorized it but it is Urdu.

Q.    Did you ever remember it? For example were you ever asked about it? You said you were asked several times by the interrogators the reason why you were in Pakistan. Did you ever tell them his name?
A.    I never mentioned that to them. They didn't asked about it.

Q.    How old are you?
A.    Twenty-four.

Q.    Do you speak or understand English?
A.    A little.

Q.    Your family, is it wealthy, poor, large or small?
A.    Wealthy.

Q.    What did they do?
A.    My dad is in the real estate business and camels.

UNCLASSIFIED/~~FOUO~~

UNCLASSIFIED/FOUO

Q. You said you never attended training camps, but do you have any military training?
A. No.

Q. Have you ever handled any weapons like bombs, explosives, guns, ordinance etc?
A. In the tribe I belong to they have all of those things, but I am scared to be close to them. When they have ceremonies they shoot in the air and I hate that.

Q. For the record are you a member of the al Qaida?
A. No.

Q. Do you belong to Al Wafa?
A. No.

Q. You mentioned that al Qaida dislikes people who don't have beards. Why do you have a beard now?
A. To prove to the detainees around me that I'm one of them and I am worshiping God. I don't have anything to do with when I was young going around doing things they don't like. I asked many times to the interrogators to put me some place where I don't have to see them. I want to get rid of this fear.

Q. I'm trying to understand. You said that when you were arrested in Pakistan, it was your first time there and that you were only there three to four days?
A. Those three four days was just when I met the other guy.

Q. How long were you in Pakistan before you were arrested?
A. I use to have notes. As I said before I don't know the exact time when I entered into Pakistan. I can't recall how many days I spent there in Pakistan. If you have the invoices and slips from the hotel you could tell how many I was there.

Q. The individual that you met how did you meet him?
A. I met him in Islamic (inaudible) to King Fasal mosque. I was lost. I didn't know how to get back to my hotel. The places look the same. I don't know the names. I went to him to see if he could help me. He asked me, what do you need? I asked him if he could tell me how to get back to my hotel or to go back to Saudi Arabia. The reason I wanted to go back to Saudi Arabia was because I thought I was never going to get to the hotel to get my own money. I asked him if he could help me and give me some money as a loan just to get back to Saudi Arabia, as a loan.

Q. You had ninety thousand dollars when you were captured. Why did you need a loan to get home?
A. It wasn't on me at that time. It was at the hotel, which I didn't know how to get back to.

Q. The ninety thousand dollars was lost then. You were separated from your money?

UNCLASSIFIED/FOUO

UNCLASSIFIED/~~FOUO~~

A.  I thought maybe I lost it because maybe I wasn't going to get back to the hotel.

Q.  Was the money in a safe or in your room?
A.  In a samsonite handbag. The bank note was small.

Q.  When you travel to Pakistan, how did you get there?
A.  I went by airplane to Saudi Arabia to Pakistan.

Tribunal President's questions.

Q.  This gentlemen that you met on the street. Why did he stay with you?
A.  We both had a lot of money and we wanted to be together to protect each other because there are a lot of thieves. He said stay with me until I give the money to a charity organization.

Q.  That was the first time you had ever met this individual correct?
A.  Yes.

Q.  Maybe you didn't understand, but in the unclassified he had attended paramilitary training camps. Would you have known that? Did you talk about that sort of thing?
A.  I could not tell if he had had any training. He was with me in the car and I'm driving. I had a laptop. There was a movie, I didn't ask what kind of movie. He said that he didn't care about it. I'm sorry to tell you that some of those movies were adult's movies. If he were a fanatic(ph) or a terrorist, he would have let me know to turn it off because he doesn't want to see it.

Q.  You had made assumptions about him, but you didn't know the particulars about him? You didn't know in-depth information about him?
A.  Yes you are right.

Q.  Can you tell me what happen when you were arrested? How did that happen?
A.  I was coming from Karachi going to Quetta(ph). A Pakistani individual told me, if you are looking for any charitable organization they are in Quetta. We were looking for them and it was nighttime. We entered into the suburbs of Quetta. There was a driver and his helper with us. They made one turned and they said those are the needy people. This was in the very suburbs of Quetta. We were scared to get out because maybe they would take all of the money. We ask the driver to get back. I told the driver we have decided to give it to one organization not to individuals. It is safer and less hassle if we go and look for an organization to give them the money and get a receipt from them and they can go and do whatever they want with the money. When we went back we pass the same checkpoint. That was just ten minutes ago. When we tried to go thru the checkpoint they arrested us.

UNCLASSIFIED/~~FOUO~~

UNCLASSIFIED/~~FOUO~~

Q.  What reason did they give you for arresting you?
A.  They said that you are Arabs. Even when I talked to one of them in English, he said there is nothing against us, but he asked for five thousand dollars. He said that the United States will buy you for ten thousand dollars, five thousand dollars per person. At that time I don't blame the United States because of what had happened at that time, it was a disaster. I thought I would only be detained for days but it looks like it has been a while.

Q.  Would you normally carry around that much money? Wouldn't you use a bank?
A.  That was the cash money that I got from the French man I sold the mummies to. My plan was to transfer this money to Saudi Arabia. I went to the bank to exchange it from dollars to Kuwaiti because the bank notes are smaller.

Q.  If you were going to return to Saudi Arabia. Wouldn't they question you for entering the country with that amount of money?
A.  Not the amount because the size of it was little. They would never ask, if it was with me. My plan was to transfer the money to Saudi Arabia. I was thinking about depositing this money in a visa card.

Q.  If you had not been arrested what were plans? Were you staying in Pakistan or were you going somewhere else?
A.  I was planning to go back to Saudi Arabia because it was only nine days before Eid(ph)

Q.  Was your family expecting you to return?
A.  Yes and there were a lot of gifts for them.

Q.  Did they contact the Pakistani government to find out what happen to you when you didn't return?
A.  I always call my family, but the last time was when a representative from the Saudi Arabia embassy in Pakistan said to me in three days you will be free. I called my family and told them that in three days I will be in Saudi Arabia.

Q.  The last time you talked to your family you were in jail?
A.  I was in the Red Crescent before they transferred me to prison. We were under Saudi Arabia embassy custody. The Pakistani's wanted us to be in prison but Saudi Arabia said that there is nothing against them so let them go.

Q.  When you were arrested did they put you in a Pakistan jail?
A.  After I met with Saudi Arabia or before?

Q.  When you were arrested at the checkpoint?
A.  They took me to the Pakistani intelligence building, not a prison. We stayed there for five days, in that building. Then they took us to General Hospital. We went on a hunger strike where we didn't eat for five days. I spent one night in General Hospital. The Saudi embassy representative came and took me to the Saudi

UNCLASSIFIED/~~FOUO~~

UNCLASSIFIED/~~FOUO~~

Arabia Red Crescent. I stayed in the Red Crescent for eight days and then they took me to the Pakistani prison. The Saudi Arabia embassy representative apologized. He said we couldn't do anything. The United States wants you. They the United States is bigger than Saudi Arabia so your will be going with the Americans. They assured us that we would be free in a very short time.

Q.    What happened to your money when you were arrested?
A.    The money, books and all of my stuff was signed for on a piece of paper by the head of Pakistani Intelligence Service, his name is Ali Abbott(ph), a representative from Saudi Arabia embassy and a representative from the court I went thru in Pakistan. They signed that piece of paper saying that all these things belong to me. When they took me to the prison they brought all of my stuff with that piece of paper to the prison. This is one of the last two times I saw my stuff, at this time when I am talking to you when they transferred me to you and the other time when the American interrogators sat with me. I signed the paper by my fingerprint when I met the Americans for the first time. They showed me what I had and everything was there. That piece of paper was in Arabic language. There was another piece of paper in another language but I don't know what was on that paper.

Q.    Basically they had you verify that these belongings actually belonged to you?
A.    Yes ma'am.

Tribunal Members' questions continues

Q.    One area that confused me and that's your willingness to leave your money in your hotel by going to Saudi Arabia. That didn't make sense to me and I wanted to see if you wanted to explain that?
A.    My plan was not to leave the money there. When I met the other individual I was seeking his help to go get the money and to be with him because that was a lot of money. I was trying to explain that but I didn't want to cut off his question.

Translator: Can I say something here? I don't why he only said it once, but he mentioned that when he got lost he thought he was not going to see that money again, that is what he said.

Detainee: I explained everything with my Personal Representative. I wish you a long life. There is something I want to say but I am to shy to say it.

Tribunal President: This is your only opportunity.

Detainee: If you send me back or stay here, I want to stay because I'm guilty not because I'm innocent. I am worried about the people around me always telling me that I'm a spy. If you send me back to Saudi Arabia people will say that you collaborated with the Americans that is why they let you go.

UNCLASSIFIED/~~FOUO~~

UNCLASSIFIED/~~FOUO~~

Tribunal President: We will take that into consideration and we will certainly note it in the record that you have these concerns.

Detainee: God bless you for what you said. If I go back because I'm innocent I don't think I will survive.

*The Tribunal President confirms that the detainee had no further evidence or witnesses to present to the Tribunal.*

*The Tribunal President explains the remainder of the Tribunal process to the detainee and adjourns the Tribunal.*

## AUTHENTICATION

I certify the material contained in this transcript is a true and accurate summary of the testimony given during the proceedings.



Colonel, United States Army
Tribunal President

UNCLASSIFIED//FOUO

# DETAINEE ELECTION FORM

| | |
|---|---|
| **Date:** | 18 DEC 04 |
| **Start Time:** | 1300 |
| **End Time:** | 1415 |

**ISN#:** 340

**Personal Representative:** ███████████ LTC, US ARMY

**Translator Required?** YES          **Language?** ARABIC

**CSRT Procedure Read to Detainee or Written Copy Read by Detainee?** _____

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## Detainee Election:

[X]  **Wants to Participate in Tribunal**

[ ]  **Affirmatively Declines to Participate in Tribunal**

[ ]  **Uncooperative or Unresponsive**

## Personal Representative Comments:

Detainee will participate. He will provide an oral presentation regarding the allegations read to him by the PR. He may of may not take an oath (unsure at interview). He has requested one witness whom he as identified as a Camp 5 detainee **ISN 243 (Bendar ((Al-Utaibi)).** The detainee says he knew him for only four days prior to capture (both at same time). But he could explain what detainee was going to do, where the money came from and that the detainee never trained in a camp.

Personal Representative: ██████████████████

UNCLASSIFIED//~~FOUO~~                        Exhibit D-a

UNCLASSIFIED

### Combatant Status Review Board

TO: Personal Representative

FROM: OIC, CSRT (14 December 2004)

Subject: Summary of Evidence for Combatant Status Review Tribunal – AL DUBAYKHI, Bassam Muhammad Salih

1. Under the provisions of the Secretary of the Navy Memorandum, dated 29 July 2004, *Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at Guantanamo Bay Naval Base Cuba*, a Tribunal has been appointed to review the detainee's designation as an enemy combatant.

2. An enemy combatant has been defined as "an individual who was part of or supporting the Taliban or al Qaida forces, or associated forces that are engaged in hostilities against the United States or its coalition partners. This includes any person who committed a belligerent act or has directly supported hostilities in aid of enemy armed forces."

3. The United States Government has previously determined that the detainee is an enemy combatant. This determination is based on information possessed by the United States that indicates that the detainee is associated with al Qaida.

   A. The detainee is associated with al Qaida:

     1. The detainee traveled from Saudi Arabia to Pakistan and the United Arab Emirates in September 2001.

     2. The detainee was arrested at a checkpoint in Pakistan.

     3. The detainee was in possession of a large sum of money when captured.

     4. The detainee was arrested with another individual.

     5. This individual was a fighter at Tora Bora.

     6. This individual also attended paramilitary training camps.

     7. This individual was also the director of the Al Wafa organization in Herat.

     8. Al Wafa is a non-governmental agency considered a terrorist organization.

     9. The detainee met with a known al Qaida facilitator.

     10. The detainee may have attended a terrorist training camp.

     11. The detainee received special training in Kabul.

4. The detainee has the opportunity to contest his designation as an enemy combatant. The Tribunal will endeavor to arrange for the presence of any reasonably available witnesses or evidence that the detainee desires to call or introduce to prove that he is not an enemy combatant. The Tribunal President will determine the reasonable availability of evidence or witnesses.

UNCLASSIFIED         **EXHIBIT R- 1**

**Memorandum** 

---

To  :  Department of Defense     Date 12/14/2004
      Office of Administrative Review
      for Detained Enemy Combatants
      Capt. Charles Jamison, OIC, CSRT

From :  FBI GTMO
      Counterterrorism Division █████████
      Asst. Gen. Counsel █████████

Subject  REQUEST FOR REDACTION OF
      <u>NATIONAL SECURITY INFORMATION</u>
      ████████████

      Pursuant to the Secretary of the Navy Order of 29 July
2004, Implementation of Combatant Review Tribunal Procedures for
Enemy Combatants Detained at Guantanamo Bay Naval Base, Cuba,
Section D, paragraph 2, the FBI requests redaction of the
information herein marked[1].  The FBI makes this request on the
basis that said information relates to the national security of
the United States[2].  Inappropriate dissemination of said
information could damage the national security of the United
States and compromise ongoing FBI investigations.

CERTIFICATION THAT REDACTED INFORMATION DOES NOT SUPPORT A
DETERMINATION THAT THE DETAINEE IS NOT AN ENEMY COMBATANT

      The FBI certifies the aforementioned redaction contains
no information that would support a determination that the
detainee is not an enemy combatant.

      The following documents relative to ISN 340 have been
redacted by the FBI and provided to the OARDEC:

FD-302 dated 06/14/02
FD-302 dated 08/08/02

---

[1]Redactions are blackened out on the OARDEC provided FBI document.

[2]See Executive Order 12958

EXHIBIT R-**2**

*pg 1 of 2*

Memorandum from ███████████ to Capt. Charles Jamison
Re:  REQUEST FOR REDACTION, 12/14/2004


If you need additional assistance, please contact Asst. Gen.
Counsel ███████████████████████████████ ,
███████████████████████████ or IS ███████████████████

1 - ███████████████████████
1 - ███████████████████████
1 - ███████████████████████
1 - ███████████████████████
① - ███████████████████████
1 - ███████████████████████
███████

pg 2 of 2



UNCLASSIFIED

U.S. Department of Homeland Security
U.S. Customs and Border Protection
Office of Border Patrol

# Terrorist Organization
# Reference Guide

January 2004

pg 1 of 6

EXHIBIT R-3

UNCLASSIFIED

## Table of Contents

|  | Designated Foreign Terrorist Organizations | 1 |
|---|---|---|
| 1. | Abu Nidal organization (ANO) | 2 |
| 2. | Abu Sayyaf Group (ASG) | 3 |
| 3. | Al-Aqsa Martyrs Brigade | 4 |
| 4. | Armed Islamic Group (GIA) | 5 |
| 5. | 'Asbat al-Ansar | 5 |
| 6. | Aum Supreme Truth (Aum) Aum Shinrikyo, Aleph | 6 |
| 7. | Basque Fatherland and Liberty (ETA) | 7 |
| 8. | Communist Party of Philippines/New People's Army (CPP/NPA) | 8 |
| 9. | Al-Gama'a al-Islamiyya (Islamic Group, IG) | 9 |
| 10. | HAMAS (Islamic Resistance Movement) | 10 |
| 11. | Harakat ul-Mujahidin (HUM) | 11 |
| 12. | Hizballah (Party of God) | 13 |
| 13. | Islamic Movement of Uzbekistan (IMU) | 14 |
| 14. | Jaish-e-Mohammed (JEM) | 15 |
| 15. | Jemaah Islamiya (JI) | 16 |
| 16. | Al-Jihad (Egyptian Islamic Jihad) | 17 |
| 17. | Kahane Chai (Kach) | 18 |
| 18. | Kurdistan Workers' Party (PKK, KADEK) | 18 |
| 19. | Lashkar-e-Tayyiba (LT) | 20 |
| 20. | Lashkar I Jhangvi (LJ) | 21 |
| 21. | Liberation Tigers of Tamil Eelam (LTTE) | 22 |
| 22. | Mujahedin-e Khalq Organization (MEK or MKO) | 23 |
| 23. | National Liberation Army (ELN) - Colombia | 24 |
| 24. | Palestine Islamic Jihad (PIJ) | 25 |
| 25. | Palestine Liberation Front (PLF) | 26 |
| 26. | Popular Front for the Liberation of Palestine (PFLP) | 26 |
| 27. | Popular Front for the Liberation of Palestine - General Command (PFLP-GC) | 27 |
| 28. | Al-Qaeda | 28 |
| 29. | Real IRA (RIRA) | 29 |
| 30. | Revolutionary Armed Forces of Colombia (FARC) | 30 |
| 31. | Revolutionary Nuclei | 31 |
| 32. | Revolutionary Organization 17 November (17 November) | 32 |
| 33. | Revolutionary People's Liberation Party/Front (DHKP/C) | 33 |
| 34. | Salafist Group for Call and Combat (GSPC) | 34 |
| 35. | Sendero Luminoso (Shining Path or SL) | 35 |
| 36. | United Self-Defense Forces/Group of Colombia (AUC) | 36 |
|  | Other Foreign Terrorist Organizations | 39 |
| 37. | Al-Badhr Mujahedin (al-Badr) | 40 |
| 38. | Alex Boncayao Brigade (ABB) | 40 |
| 39. | Al-Ittihad al-Islami (AIAI) | 41 |
| 40. | Allied Democratic Forces (ADF) | 42 |
| 41. | Ansar al-Islam (Iraq) | 42 |
| 42. | Anti-Imperialist Territorial Nuclei (NTA) | 43 |

UNCLASSIFIED

Pg 2 of 6

43. Army for the Liberation of Rwanda (ALIR) ............................................................ 44
44. Cambodian Freedom Fighters (CFF) ................................................................... 45
45. Communist Party of Nepal (Maoist)/ United People's Front .................................. 46
46. Continuity Irish Republican Army (CIRA) ............................................................ 47
47. Eastern Turkistan Islamic Movement (ETIM) ...................................................... 47
48. First of October Antifascist Resistance Group (GRAPO) ...................................... 48
49. Harakat ul-Jihad-I-Islami (HUJI) ......................................................................... 49
50. Harakat ul-Jihad-I-Islami/Bangladesh (HUJI-B) .................................................. 50
51. Hizb-I Islami Gulbuddin (HIG) ........................................................................... 50
52. Hizb ul-Mujahedin (HM) .................................................................................... 51
53. Irish Republican Army (IRA) ............................................................................... 52
54. Islamic Army of Aden (IAA) ............................................................................... 53
55. Islamic International Peacekeeping Brigade (IIPB) .............................................. 54
56. Jamiat ul-Mujahedin (JUM) ............................................................................... 55
57. Japanese Red Army (JRA) ................................................................................. 55
58. Kumpulan Mujahidin Malaysia (KMM) ................................................................ 56
59. Libyan Islamic Fighting Group ........................................................................... 57
60. Lord's Resistance Army (LRA) ........................................................................... 58
61. Loyalist Volunteer Force (LVF) ........................................................................... 58
62. Moroccan Islamic Combatant Group (GICM) ...................................................... 59
63. New Red Brigades/Communist Combatant Party (BR/PCC) ................................ 60
64. People Against Gangsterism and Drugs (PAGAD) ............................................. 61
65. Red Hand Defenders (RHD) .............................................................................. 62
66. Revolutionary Proletarian Initiative Nuclei (NIPR) ............................................. 62
67. Revolutionary United Front (RUF) ...................................................................... 63
68. Riyadus-Salikhin Reconnaissance and Sabotage Battalion of Chechen Martyrs  64
69. Sipah-I-Sahaba/Pakistan (SSP) ........................................................................ 65
70. Special Purpose Islamic Regiment (SPIR) ......................................................... 65
71. The Tunisian Combatant Group (TCG) ............................................................... 66
72. Tupac Amaru Revolutionary Movement (MRTA) .................................................. 67
73. Turkish Hizballah .............................................................................................. 68
74. Ulster Defense Association/Ulster Freedom Fighters (UDA/UFF) ........................ 68

Terrorist Exclusion List ......................................................................................... 71

Mexican Insurgent/Guerrilla Organizations ............................................................ 77

End Notes ............................................................................................................ 84

ii

*H·ki·o·§3,(x·i)*

## Terrorist Exclusion List

*king·men*               *pg 4 of 6*

UNCLASSIFIED

## Terrorist Exclusion List[3]

Section 411 of the USA PATRIOT ACT of 2001 (8 U.S.C. § 1182) authorized the Secretary of State, in consultation with or upon the request of the Attorney General, to designate terrorist organizations for immigration purposes. This authority is known as the "Terrorist Exclusion List (TEL)" authority. A TEL designation bolsters homeland security efforts by facilitating the USG's ability to exclude aliens associated with entities on the TEL from entering the United States.

## Designation Criteria

An organization can be placed on the TEL if the Secretary of State finds that the organization:

- commits or incites to commit, under circumstances indicating an intention to cause death or serious bodily injury, a terrorist activity;
- prepares or plans a terrorist activity;
- gathers information on potential targets for terrorist activity; or
- provides material support to further terrorist activity.

Under the statute, "terrorist activity" means any activity that is unlawful under U.S. law or the laws of the place where it was committed and involves: hijacking or sabotage of an aircraft, vessel, vehicle or other conveyance; hostage taking; a violent attack on an internationally protected person; assassination; or the use of any biological agent, chemical agent, nuclear weapon or device, or explosive, firearm, or other weapon or dangerous device (other than for mere personal monetary gain), with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property. The definition also captures any threat, attempt, or conspiracy to do any of these activities.

## Designation Process

The Secretary of State is authorized to designate groups as TEL organizations in consultation with, or upon the request of the Attorney General. Once an organization of concern is identified, or a request is received from the Attorney General to designate a particular organization, the State Department works closely with the Department of Justice and the intelligence community to prepare a detailed "administrative record," which is a compilation of information, typically including both classified and open sources information, demonstrating that the statutory criteria for designation have been satisfied. Once completed, the administrative record is sent to the Secretary of State who decides whether to designate the organization. Notices of designations are published in the Federal Register.

UNCLASSIFIED

UNCLASSIFIED

## Effects of Designation

### Legal Ramifications

Individual aliens providing support to or associated with TEL-designated organizations may be found "inadmissible" to the U.S., i.e., such aliens may be prevented from entering the U.S. or, if already in U.S. territory, may in certain circumstances be deported. Examples of activity that may render an alien inadmissible as a result of an organization's TEL designation include:

- membership in a TEL-designated organization;
- use of the alien's position of prominence within any country to persuade others to support an organization on the TEL list;
- solicitation of funds or other things of value for an organization on the TEL list;
- solicitation of any individual for membership in an organization on the TEL list; and
- commission of an act that the alien knows, or reasonably should have known, affords material support, including a safe house, transportation,
- communications, funds, transfer of funds or other material for financial benefit, false documentation or identification, weapons (including chemical,
- biological, or radiological weapons), explosives, or training to an organization on the TEL list.

(It should be noted that individual aliens may also found inadmissible on the basis of other types of terrorist activity unrelated to TEL-designated organizations; see 8 U.S.C. §1182(a)(3)(B).)

## Other Effects

1. Deters donation or contributions to named organizations.
2. Heightens public awareness and knowledge of terrorist organizations.
3. Alerts other governments to U.S. concerns about organizations engaged in terrorist activities.
4. Stigmatizes and isolates designated terrorist organizations.

## Background

On December 5th, 2001 Secretary of State Colin Powell, in consultation with the Attorney General designated the following organizations, thereby placing them on the Terrorist Exclusion List:

## Terrorist Exclusion List Designees

- Al-Ittihad al-Islami (AIAI)
- Al-Wafa al-Igatha al-Islamia

73

UNCLASSIFIED//~~FOUO~~

Detainee 243 witness for 340 Memorandum

PR met with witness 243 at 1245 hours 22 December.  243 remained silent and stoic throughout the short interview.  PR asked if he would participate by statement on behalf of another detainee – silence.  PR indicted if he would just shake his head, it would mean that he did not want to participate –stoic silence.  PR indicated that if he remained silent, that would mean that he did not want to participate – 243 remained silent and the interview was terminated.

EXHIBIT D-b

UNCLASSIFIED//~~FOUO~~

## Personal Representative Review of the Record of Proceedings

I acknowledge that on _3ʋ_ December 2004 I was provided the opportunity to review the record of proceedings for the Combatant Status Review Tribunal involving ISN #340.

      ✓ I have no comments.

      ___ My comments are attached.



_____ USA          _30 Dec 04_
Name                            Date

_____
Signature